UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- X

JULIE VASADY-KOVACS,

        Plaintiff,

  - against -

DEUTSCHE BANK SECURITIES INC.,

        Defendant.

---------------------------------------- X

10 CIV 5017

ECF CASE

10 Civ.

COMPLAINT

PLAINTIFF DEMANDS
A TRIAL BY JURY

     Plaintiff Julie Vasady-Kovacs ("Vasady-Kovacs" or "plaintiff"), through her attorneys, Vladeck, Waldman, Elias & Engelhard, P.C., complains of defendant Deutsche Bank Securities, Inc. ("DB" or "defendant") as follows:

## NATURE OF THE ACTION

    1.    Plaintiff brings this action to remedy discrimination on the basis of sex in the terms and conditions of employment, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"); the New York State Executive Law § 290 et seq. ("Executive Law"); and the Administrative Code of the City of New York § 8-101 et seq. ("City Law") and to remedy age discrimination in the terms and conditions of employment, in violation of the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621 et seq. ("ADEA"); the Executive Law, and the City Law.

    2.    Plaintiff seeks injunctive and declaratory relief, compensatory and punitive damages, liquidated damages, and other appropriate legal and equitable relief pursuant to Title VII, the ADEA, the Executive Law, and the City Law.

267480 v1

## JURISDICTION AND VENUE

3.  This Court has jurisdiction pursuant to 42 U.S.C. § 2000e § 5(f)(3), 29 U.S.C. § 626(c) and 28 U.S.C. § 1331. Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over plaintiff's claims brought under the Executive Law, and the City Law.

4.  Plaintiff filed a charge with the United States Equal Employment Opportunity Commission (the "EEOC") on or about July 6, 2009, complaining of the acts of sex discrimination and retaliation alleged herein. Upon plaintiff's request, the EEOC issued plaintiff a notice informing her of her right to sue defendant, which she received on April 5, 2010. Plaintiff has thus complied fully with all prerequisites required by Title VII.

5.  Pursuant to § 8-502(c) of the City Law, prior to filing this Complaint, plaintiff served a copy of the Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

6.  Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the unlawful practices complained of herein occurred within the Southern District of New York and defendant regularly does business within the Southern District of New York.

## PARTIES

7.  Plaintiff is a woman who worked for defendant from September 2006 until her employment was involuntarily terminated on December 12, 2008.

8.  Upon information and belief, defendant DB is a financial services corporation that is incorporated in the state of Delaware and has its principal place of business in the state of New York. DB is an employer within the meaning of Title VII, the ADEA, the Executive Law, and the City Law.

## FACTS

9. Plaintiff is a 49-year-old woman, born in January 1961.

10. Plaintiff graduated from New York University School of Law in 1988. After law school, she was an Assistant District Attorney in New York City for five years. Her next position was Assistant Counsel for the New York State Office of the State Inspector General. She then worked for the New York Stock Exchange for over seven years as Trial Counsel in the Division of Enforcement. Her last position just prior to DB was as a Vice President in the Compliance Department at Morgan Stanley.

11. In September 2006, DB hired plaintiff as Director of the Supervisory and Internal Controls ("SIC") group within the Americas Compliance Department.

12. Plaintiff's first supervisor was Patty Terani ("Terani"), the Director of Policy, Communications and Training, who was responsible for hiring plaintiff. In or about November 2006, Terani's group was restructured and plaintiff began reporting to Rudy Gerlich ("Gerlich"), another Director and Counsel to Erick Gallinek, Managing Director and head of DB Compliance Americas. After another reorganization in or about September 2007, plaintiff reported to John Caruso ("Caruso"), the head of the Anti-Money Laundering ("AML") group and a Managing Director. Within a year, the unit plaintiff managed formally became the Political and Internal Controls Unit ("PICA") and plaintiff had four Compliance professionals reporting to her.

13. Plaintiff was initially hired to manage the SIC process. Within a month of her reassignment to Gerlich and two months of her start at DB, Gerlich assigned plaintiff and two other attorneys the additional responsibility of developing a process to manage and comply with rules governing political contributions to municipal finance professionals. Plaintiff

volunteered to head up the effort and assumed full responsibility for the initiative. These responsibilities soon took most of plaintiff's time and she was ultimately assigned additional staff to manage the workload. Plaintiff's responsibilities soon further expanded to cover reviewing the political contributions of all DB U.S. employees; pay-to-play reporting; gifts and entertainment by all DB employees to U.S. government officials; oversight of lobbying requirements; gifts to government employee or public officials; and co-managing the Federal Corrupt Practices Act ("FCPA") compliance. However, when plaintiff was in charge of PICA, she continued to have responsibility for SIC.

14. Throughout plaintiff's employment with DB, women in the Compliance department were not treated as well as the men.

15. Before plaintiff was hired, she was shown the office with a window to which she would be assigned if she accepted the position. However, the office promised to plaintiff remained vacant, and then was assigned to a man at a lower level. Other vacant offices were assigned to men at or below plaintiff's level. Plaintiff, like other female Directors in the department, never received an office, and was instead assigned to a cubicle. Upon information and belief, the existing office practice for assigning offices was revised several times in order to assign offices to men rather than to similarly situated women with longer tenures at DB.

16. Upon information and belief, there were several complaints of sexual harassment made within the Compliance Department within the few years prior to the termination of plaintiff's employment.

17. Upon information and belief, women in the Compliance Department were paid less than comparable men, including less in bonus compensation.

18. During plaintiff's employment, there were no female Managing Directors in the Compliance Department in New York, and far fewer female Directors than male Directors. While qualified women were passed over for promotion to Managing Director, men with documented sexual harassment complaints were treated favorably and promoted. For example, upon information and belief, one man was promoted to Managing Director despite having such a poor record on sexual harassment that DB will not permit him to have a female administrative assistant; he is assigned the only male administrative assistant in the department.

19. Women, particularly older women, generally were not afforded the same respect and opportunities as men in the department. For example:

   a. There is an annual Global Compliance corporate training program called "Compliance Bootcamp." This training program is designed to put Compliance professionals across the globe into a training environment where they will have direct exposure to the higher levels of corporate management. It is considered a privilege to be asked to attend the one-week program, which is in a different international location each year. Plaintiff heard through word of mouth that the participants for 2008 were being chosen but there was never a formal announcement of the program nor instructions distributed about how employees could be nominated by their managers to attend. Plaintiff asked Caruso about the nomination process for the program because she wanted to nominate one of her employees as a participant. Caruso told plaintiff that the participants had all been chosen, there was no open nomination process and that her candidate would not be considered. The candidate was a single mother in her forties, up for promotion, who was very highly regarded by her colleagues and had always

received very high performance reviews. Plaintiff asked why the employee would not be considered. Caruso told plaintiff that the employee was not the right "sort" of candidate and that she probably would not want to go anyway because of her family responsibilities.

    b.    In approximately the fall of 2008, plaintiff recommended that one of her female direct reports, who is over 50, be allowed to take advantage of the DB policy of paying for additional education and licensing and be permitted to go to law school at night because it would significantly increase her skills in her current role. Caruso expressed surprise and said that it was "funny" that this employee would want to obtain a law degree because she was over 50.

    c.    Another senior female attorney in her 60s was slowly marginalized, demoted, and made to spend most of her time creating monthly reports, instead of the legal and regulatory work she was hired, and qualified, to do. This woman had extensive regulatory experience and had attained numerous licenses and credentials. Caruso subsequently terminated her employment. Other women were similarly forced out of their jobs or discharged, demoralized, and routinely denied professional opportunities.

20.    When plaintiff began reporting to Caruso, she was the only woman reporting directly to him. Caruso had lunch almost every day with the AML men reporting to him. Plaintiff was never invited. Plaintiff asked Caruso why she was excluded. After that, Caruso invited her to lunch only two times over the course of an entire year, but continued to regularly meet for lunch with the men reporting to him.

21. Prior to reporting to Caruso, plaintiff received positive performance reviews. On a scale of 1 to 5, with 5 being the best (and, upon information and belief, rarely awarded to employees), she was rated 4 or 3 in every category. In or about fall 2007/spring 2008, DB announced the development of a new performance review process. Plaintiff learned that Caruso should be giving her ratings on a quarterly basis, although she had not been advised of any ratings by Caruso. After plaintiff learned about the quarterly ratings from Human Resources ("HR"), Caruso advised plaintiff that she would continue to be rated with 4s and 3s.

22. In or about November 2008, one of plaintiff's peers arranged for a friend of his to give a management training class to his team. Caruso suggested that the peer include plaintiff and her team, which the peer agreed to do. Plaintiff's team consisted of five women, including plaintiff. The peer's team consisted of two women and one man. The female administrative assistants and analysts were also invited. When plaintiff learned that the class would be based around reading the Herman Melville novel *Billy Budd* and doing role-playing in the various leadership roles, she said that the class sounded fun, but in light of the ratio of women in the class and the fact that there were no female characters in *Billy Budd*, perhaps they could take that into account in the role-playing to explore if changing the sex of the leadership roles might affect the outcome of the role-play. Plaintiff's peer said he thought it was a great idea. When plaintiff made the same suggestion to Caruso, he said he thought it was a "stupid" idea to do role-playing from the perspective of a female captain or crew. Caruso became argumentative and said that it would never occur to him to role-play as a woman. Plaintiff pointed out that that was perhaps because he was a man in a leadership role. He continued to say the idea was ridiculous and stupid and that it was a waste of time to consider any of the leadership roles from a female perspective.

23. On Monday, December 8, 2008, plaintiff was called into a meeting with Caruso and Marianne Perry ("Perry") from HR. They told plaintiff that her job was being eliminated. They said her last day in the office would be that Friday, to allow her to transition her responsibilities and finish her work for DB.

24. The only other Director laid off at the same time was a man whose business had dried up with the collapse of the credit markets. Plaintiff's area of the law was, and continues to be, a growing area of the law. Plaintiff was the only Compliance and Legal professional in the Americas and globally handling this area of the law, which is considered by other similarly situated financial institutions as critical to doing business with any U.S. federal and state governmental entities, agencies, or public authorities.

25. On Friday, December 12, 2008, plaintiff met with Perry to ask her a few questions about benefits. Plaintiff also told Perry that she had not been treated well in the Compliance Department and that it was generally a poor environment for women. Plaintiff said that she was aware of problems with sexual harassment and significant instances in which women were treated less favorably than similarly situated men. Plaintiff also said that she did not think she was being treated fairly and that her responsibilities had not been affected by the recent economic crisis.

26. After plaintiff met with Perry on her last day in the office, she returned to her cubicle. While plaintiff was getting ready to leave, she was approached by Wayne Salit ("Salit"), a younger, less experienced man in the AML group. Salit told plaintiff that he was "taking over [her] job" and asked her if she had time to talk to him about her role before she left. Salit's role in AML was far less sophisticated than plaintiff's role. Upon information and belief, he had no experience in the far more complex area of political law for which plaintiff had been

responsible, and was mainly responsible for filling out AML Suspicious Activity Reports. Salit had only recently been assigned to work with plaintiff on following up with FCPA questions, an assignment Caruso told plaintiff that he gave to Salit in order to help promote his career.

27.  Plaintiff complained to Perry about learning that that Salit was taking over her job. After this complaint, plaintiff was later told that her responsibilities in the political law area had been divided among three to four male AML employees, including Salit, none of whom had any prior experience in this area.

28.  After plaintiff's employment was terminated, Caruso had no women reporting directly to him other than two women at the VP level who had previously reported to plaintiff.

29.  Upon information and belief, during Caruso's long tenure at DB, despite having approximately fifty or more people reporting to him, Caruso has never initiated the promotion of a woman. Moreover, when forced to implement a reduction in force in his group, he has chosen only older, senior-level women, although the majority of employees who report to him are men. Upon information and belief, prior to the time plaintiff began reporting to Caruso, he laid off the only two other female Directors who have ever reported to him at DB.

30.  Upon information and belief, DB has laid off a disproportionate number of women, including highly competent women. At the time plaintiff's employment was terminated, the last time a senior male employee in the Compliance Department was laid off (other than the man let go the same day as plaintiff, whose business had dried up) was in approximately 2005, when the Compliance Department was reorganized and Gallinek was transferred from London to replace man who was laid off.

31.  Since 2005, when Gallinek began managing the Americas Compliance Department, only men have been promoted to Managing Director. Upon information and belief, there are currently no female Managing Directors in the Americas Compliance Department.

32.  The attitude toward women at DB comes from the very highest levels of management. In the fall of 2008 plaintiff attended the Women on Wall Street Conference, one of the biggest women's events for the financial industry. Seth Waugh ("Waugh"), Chief Executive Officer of DB Americas gave the opening speech. Waugh said, "This event is my favorite event of the whole year because it is the day that I get the most kisses."

## FIRST CAUSE OF ACTION

(Title VII)

33.  Plaintiff repeats and realleges paragraphs 1 through 32 of this Complaint as if fully set forth herein.

34.  Defendant discriminated against plaintiff in the terms and conditions of her employment based on her gender in violation of Title VII.

35.  Defendant acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

36.  As a result of defendant's discriminatory acts, plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation and other compensable damage unless and until this Court grants relief.

## SECOND CAUSE OF ACTION

(ADEA)

37. Plaintiff repeats and realleges paragraphs 1 through 36 of this Complaint as if fully set forth herein.

38. By the acts and practices described above, defendant has discriminated against plaintiff in the terms and conditions of her employment on the basis of her age, in violation of the ADEA.

39. Defendants knew that its actions constituted unlawful discrimination on the basis of age or showed reckless disregard for plaintiff's statutorily protected rights. These violations are willful within the meaning of the ADEA.

40. Plaintiff is now suffering irreparable injury and monetary damage from defendant's discriminatory conduct and will continue to do so unless and until the Court grants relief.

## THIRD CAUSE OF ACTION

(Executive Law)

41. Plaintiff repeats and realleges paragraphs 1 through 40 of this Complaint as if fully set forth herein.

42. Defendant discriminated against plaintiff in the terms and conditions of her employment based on her gender and age in violation of the Executive Law.

43. As a result of defendant's discriminatory acts, plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation and other compensable damage unless and until this Court grants relief.

## FOURTH CAUSE OF ACTION

(City Law)

44. Plaintiff repeats and realleges paragraphs 1 through 43 of this Complaint as if fully set forth herein.

45. Defendant discriminated against plaintiff in the terms and conditions of her employment based on her gender and age in violation of City Law.

46. As a result of defendant's discriminatory acts, plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation and other compensable damage unless and until this Court grants relief.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment:

(a) declaring that the acts and practices complained of herein are in violation of Title VII, the ADEA, the Executive Law, and the City Law;

(b) preliminarily and permanently enjoining and restraining these violations of Title VII, the ADEA, the Executive Law, and the City Law;

(c) directing defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect plaintiff's employment opportunities;

(d) directing defendant to place plaintiff in the position she would have continued to occupy but for defendant's discriminatory treatment of her, and make her whole for all earnings she would have received but for defendant's conduct, including, but not limited to, wages,

bonuses, commissions, incentive compensation, health care benefits, paid time off, pension, and other lost benefits;

 (e) directing defendant to pay plaintiff an additional amount as liquidated damages, as provided by Section 7(b) of the ADEA, 29 U.S.C. § 626(b);

 (e) directing defendant to pay plaintiff compensatory damages for her mental anguish and humiliation;

 (f) directing defendant to pay plaintiff punitive damages pursuant to Title VII and the City Law;

 (g) awarding plaintiff interest and the costs of this action together with reasonable attorneys' fees;

 (h) awarding plaintiff damages for any adverse tax consequences; and

 (i) awarding such other and further relief as this Court may deem necessary and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated: New York, New York
   June 29, 2010

        VLADECK, WALDMAN, ELIAS
        & ENGELHARD, P.C.

      By: _____
        Anne L. Clark
        Attorneys for Plaintiff
        1501 Broadway, Suite 800
        New York, New York 10036
        (212) 403-7300